**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **GRESHAM INVESTMENT MANAGEMENT LLC,** ) | |
| ) | |
| **Plaintiff,** ) | No. __**1:25-cv-4651**_____ |
| ) | |
| **v.** ) | |
| ) | **COMPLAINT** |
| **PRESTON NIBLACK, in his capacity As Commissioner of the New York City Department of Finance** ) | |
| ) | |
| **Defendant.** ) | |

Plaintiff Gresham Investment Management, LLC ("Gresham"), by and through its undersigned attorneys, McDermott Will & Emery LLP, as and for its Complaint against Preston Niblack, in his capacity as Commissioner of the New York City Department of Finance ("Defendant"), alleges as follows:

**NATURE OF ACTION**

1.      The primary question in this matter is whether Gresham – a Commodity Pool Operator ("CPO") and a Commodity Trading Advisor ("CTA") registered as such with the Commodities Futures Trading Commission ("CFTC") – correctly computed its gross income percentage using the sourcing rules applicable to a "broker or dealer registered as such by . . . the commodities futures trading commission" (*see* N.Y.C. Admin. Code § 11-508(e-3)) ("CFTC Sourcing Provision") for purposes of computing its New York City Unincorporated Business Tax ("UBT") during the tax years ended 2011 through 2013 (the "Years at Issue").

2.      This action arises from the lack of a meaningful procedural option to challenge the amounts asserted as due against Gresham by the New York City Department of Finance (the "Department") for Gresham's tax years ended 2011 through 2013 following an audit, which were largely based on the Department's position that CPOs and CTAs do not qualify as a "broker or dealer registered as such by . . . the commodities futures trading commission" pursuant to N.Y.C. Admin. Code § 11-508(e-3). The Department also asserted taxes due for other unrelated reasons (described below) and asserted penalties.

3.      In order to compute the New York City UBT, Gresham is required to determine which portion of its income comes from New York City. That determination is made using three ratios that compare an in-City amount to a total amount, i.e., property located in the City divided by total property (the "property percentage"), payroll costs attributable to in-City personnel divided by total payroll costs (the "payroll percentage"), and receipts generated from New York City source divided by total receipts (the "gross income percentage").

4.      The more receipts a taxpayer has sourced, or assigned, to New York City for purposes of the gross income percentage, the higher the taxpayer's UBT liability.

5.      The relevant gross income percentage sourcing rules are found in N.Y.C. Admin. Code § 11-508(e-3). The CFTC Sourcing Provision assigns the receipts to the "mailing address in the records of the taxpayer of the customer who is responsible for paying such fees." Persons that do not qualify for such treatment assign such receipts to where the services are performed that generate the receipts. For a New York City-based CPO/CTA, the difference in the two sourcing methods is significant as under the CFTC Sourcing Provision, Gresham's receipts are sourced throughout the world, whereas all of Gresham's receipts are sourced to New York City if it does not fall under the CFTC Sourcing Provision.

6.      The CFTC Sourcing Provision was specifically adopted to reduce the tax burden on New York City-based companies and discourage them from leaving New York to achieve lower taxes. *See* Bill Jacket 2009 Chapter 201, L. A. 8667, p. 19 (2009); *see also id.*, p. 9.

7.      In its audit of Gresham for the Years at Issue, the Department applied a sudden, unilateral changed interpretation of guidance concerning the CFTC Sourcing Provision. The Department not only changed its longstanding guidance addressing the CFTC Sourcing Provision, but it applied those changes retroactively to find deficiencies in filings paid as much as five years before the change. In doing so, the Department retroactively imposed liability on Gresham in a manner prohibited by the United States and New York constitutions. Specifically, in 2013 and 2014, prior to UBT returns being due for those years, the Department had issued guidance stating that CPOs and CTAs were "broker or dealer registered as such by . . . the commodities futures trading commission" pursuant to N.Y.C. Admin. Code § 11-508(e-3). In 2016, without warning, the Department issued new guidance that it would treat CPOs and CTAs as not eligible to apply the sourcing rules under the CFTC Sourcing Provision. Based on this new guidance, the Department determined that Gresham owed back taxes for the Years at Issue, in which Gresham had used the CFTC Sourcing Provision.

8.      Gresham filed New York City UBT returns for the Years at Issue under the CFTC Sourcing Provision consistent with the Department's guidance available at the time, which allowed Gresham to apply the sourcing rules under the CFTC Sourcing Provision under N.Y.C. Admin. Code § 11-508(e-3).

9.      In a ruling issued in 2013, prior to Gresham's UBT return being due, the Department provided the following guidance:

> While the statute refers to registering as a "broker or dealer" with the CFTC, the CFTC does not provide a designation of broker or dealer. Rather, it requires registration under one or more specific designations, with the result that a person can trade in commodities as a broker or dealer without being registered as a "broker" or "dealer." In that context, to interpret the statute as requiring registration as "broker" or "dealer" would have the effect that no person, even though trading in commodities in compliance with the CFTC, could take advantage of the tax treatment afforded by Code section 1l-508(e-3). We do not believe that it is the intent of the statute to set up a requirement that cannot be met in practice. Applying the fundamental rule in statutory construction to effectuate the intent of the legislature **we conclude the that the phrase "broker or dealer registered as such by the [SEC]" does not require that a taxpayer have registered as a "broker" or "dealer" with the CFTC, but rather that the taxpayer have complied with all registration requirements of the CFTC to act as a broker or dealer in commodities.**

N.Y.C. Dep't of Fin., Finance Letter Ruling #12-4934/UBT (Aug. 19, 2013) (internal citations omitted) (emphasis added). The Department reiterated such guidance in 2014. *See* N.Y.C. Dep't of Fin., Finance Letter Ruling #13-4950/UBT (March 28, 2014) (collectively referred to herein as "Department's First Position").

10.      In 2016, New York issued guidance stating that "taxpayers may not rely on the [Department's First Position] to take the position that unregistered entities may characterize themselves as Registered under the Broker-Dealer Provisions [(i.e., the CFTC Sourcing Provision)]." N.Y.C. Dep't of Fin., Update on Audit Issues: Business Income Taxes, Income Allocation (Nov. 25, 2016) ("Department's 2016 Change").

11.      In 2020, the Department issued Gresham a Notice of Deficiency based on the Department's 2016 Change, asserting tax, interest, and penalties for the Years at Issue primarily related to the CFTC Sourcing Provision but also related to other issues described below.

4

12.    Interest accrued for the Years at Issue at rates ranging from 7.5 to 11 percent per year from the time returns were due for the Years at Issue.

13.    Gresham appealed the Notice of Deficiency to the Department's conciliation bureau and attempted to resolve the matter with the Department. All this time, interest on the asserted tax amounts continued to accrue.

14.    Eventually, Gresham paid all tax, interest, and penalty asserted as due in order to stop the running of interest.

15.    In June 2023, Gresham filed a Petition for a Redetermination of a Deficiency to challenge the Department's determination. The Department filed an Answer and Gresham filed a Reply. To the extent such a petition was successful, Gresham would receive a refund of the taxes, interest, and penalty paid.

16.    The matter was initially assigned to an Administrative Law Judge ("ALJ") within the New York City Tax Appeals Tribunal Administrative Law Judge Division (the "ALJ Division"). An initial conference was held in January 2024. However, the assigned ALJ resigned in the summer of 2024 and the case was not re-assigned to the one remaining ALJ.

17.    Gresham filed a motion for summary determination on the CFTC Sourcing Provision issue on April 30, 2025.

18.    The ALJ Division, which is responsible for hearing Gresham's Petition, currently has no ALJs to hear or decide cases; instead, it merely has a Chief ALJ responsible for some ministerial matters, such as granting extensions and assigning matters to other ALJs if or when they are ever appointed. Therefore, the ALJ Division is unable to hear Gresham's Petition or its Motion for Summary Determination regarding the CFTC Sourcing Provision. This means that

Gresham has no remedy to retrieve the money it paid to the City and must forego use of those funds.

19.    For tax years subsequent to the Years at Issue, i.e., 2014 through the present, Gresham filed under the CFTC Sourcing Provision. Further, Gresham intends to utilize the sourcing rules under the CFTC Sourcing Provision on future returns.

20.    The Department has assigned an auditor to the tax years 2014 through 2018. In discussions with the Department, the Department has made clear that it will challenge Gresham's position on the CFTC Sourcing Provision for these later periods. To the extent adjustments related to that position result in increased tax, interest will apply at a rate ranging from 7.5 to 12 percent.

21.    The lack of a plain, speedy, and efficient remedy for interpreting the CFTC Sourcing Provision for 2011-2013 also means there is no remedy for resolving the later tax periods (2014 through the present). Indeed, the Department just recently started auditing 2014, perhaps in part because it was waiting for an answer from an ALJ. Without this court interpreting the CFTC Sourcing Provision there is no realistic timeline for resolving the issue for the Years at Issue and any subsequent tax years.

22.    The Department's interpretation of the CFTC Sourcing Provision is incorrect, and Gresham is entitled to an abatement of the amounts asserted as due in the Notice of Deficiency and to receive a return of its payment, with interest.

23.    The Department's 2016 Change is an administrative rule that was not adopted pursuant to the New York City Administrative Procedures Act and is therefore invalid.

24.    The application of the Department's 2016 Change to Gresham for the Years at Issue violates the Fifth Amendment's Due Process Clause as an unconstitutional retroactive tax.

25.     The application of the Department's 2016 Change to the Years at Issue resulted in an overpayment of taxes by Gresham, for which Gresham is entitled to a receive a return of its payment, with interest.

## PARTIES

26.     Plaintiff Gresham is a Delaware limited liability company with its principal place of business at 19 Union Square West, 11th Floor, New York, NY 10003.

27.     Defendant Preston Niblack is the Commissioner of the Department of Finance of New York City.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

29.     28 U.S.C. § 1341 does not prohibit jurisdiction, and jurisdiction is proper, inasmuch as there is not a "plain, speedy and efficient remedy" to challenge the amounts asserted as due, including on constitutional grounds through the City and State court system. Indeed, a petition (the equivalent of a complaint) was filed with the New York City Tax Appeals Tribunal nearly two years ago and there is no ALJ to hear or decide the matter; the case currently remains unassigned. Additionally, a motion for summary determination on the CFTC Sourcing Provision issue was filed on April 30, 2025, but there is no ALJ to hear or decide the motion.

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### I. Gresham Investment Management.

31.     Gresham is an investment management company which is registered as a CPO and a CTA with the CFTC. Gresham's only business is conducting the activities of a CPO and a CTA.

32.     As of September 2014, Gresham managed more than $13 billion for a variety of clients, including public and corporate pension funds, endowments, corporations, health systems, insurance companies, pooled investment vehicles, other investment advisors, and sovereign wealth funds, based in the Americas, Europe, Asia, and the Middle East.

33.     Gresham is a member of the National Futures Association (the "NFA") and operates with its own identification number under the NFA's Background Affiliation Status Information Center ("BASIC") database, where investors can check the registration status and disciplinary history of any firm or individual that conducts business in the U.S. futures exchanges "on behalf of the investing public." *See* https://www.nfa.futures.org/newsnotices/newsArticle.aspx?ArticleID=78; *see also* https://www.nfa.futures.org/investors/investor-resources/files/basic-handout.pdf (last visited June 2, 2025). The NFA is a self-regulatory organization for the U.S. derivatives industry, designated by the CFTC.

34.     Gresham makes trades on behalf of its clients. Specifically, Gresham offers the following services:

      A.     Discretionary trading authority on behalf of its clients, which includes but is not limited to the following:

          (i).     Domestic and foreign exchange-traded futures contracts and over-the-counter futures;

          (ii).     Forward contracts;

          (iii).     Swaps on certain futures contracts;

          (iv).     Treasuries and other types of securities or derivatives;

B.    Placing orders for execution of any of the above with futures commission merchants or counterparties that Gresham may select or its clients may designate; and

C.    Discretionary investing of collateral in cash-equivalents, including money market funds, short-term U.S. governmental securities, and short-term municipal securities.

35.    Gresham is typically responsible for the day-to-day trading decisions related to accounts and funds that pay a management fee and/or a performance-based fee. Gresham employs traders who initiate trades via various buy and sell orders.

36.    Gresham effects the majority of those trades for the accounts of others through an electronic platform called REDI that is operated by Refinitiv and widely used by other CPOs and CTAs.

37.    Gresham employs a group of "associated persons" registered with the CFTC.

38.    Gresham's associated persons have all passed the Series 3 license exam, which is required for individuals who wish to sell commodities, futures contracts, and derivatives. This test is administered by the NFA in the United States and is considered an essential qualification for futures brokers. *See* https://www.nfa.futures.org/registration-membership/how-to-register/proficiency-requirements.html (last visited June 2, 2025).

39.    As a CPO and CTA, Gresham receives management fees and performance-based fees.

40.    Gresham sourced management fees and performance-based fees that it received under the CFTC Sourcing Provision, and assigned such receipts to the mailing addresses of its customers.

9

**II. Gresham Timely Filed its Tax Returns and Claimed Deductions for the Years at Issue.**

41.    Gresham timely filed UBT returns (Forms NYC-204), which is the income tax return unincorporated businesses use to compute, report, and pay UBT to New York City, on or before:

        A.    September 17, 2012 (filed on extension) for the tax year ended 2011;

        B.    April 14, 2013 for the tax year ended 2012; and

        C.    April 15, 2014 for the tax year ended 2013.

42.    Gresham entered into an Office Services Agreement with Falconwood Corporation ("Falconwood"), an affiliated entity of Gresham, that was in effect during the tax year ended 2011, under which Falconwood provided office services to Gresham, including but not limited to: administrative, finance, accounting, fund administration, portfolio management and trading, marketing, IT, research, internal audit, compliance, and other services. Falconwood did not directly or indirectly own an interest in Gresham.

43.    In return for such services, Falconwood billed Gresham for the time spent by Falconwood employees, which included the employees' salaries and a proportional share of bonuses.

44.    Gresham paid $10,778,135 in service fees representing bonus payments, with respect to Falconwood employees. Of that amount, $5,886,117 is deductible, as it was paid with respect to Falconwood employees. The remaining $4,892,018 was paid with respect to two individuals, Douglas Hepworth, a 5.86% partner in Gresham in 2011, and Jonathan Spencer, an 8.79% partner in Gresham in 2011.

45.    Gresham further reported a deduction of $9,556,223 for "Allocated Salaries." Approximately 50% of this amount consisted of properly deductible overhead expenses. The

remaining expenses were paid to reimburse Falconwood for compensation it paid to its employees. Gresham asserts that the full $9,556,223 is properly deductible.

46.      In 2012 and 2013, Gresham had approximately 51 of its own employees that provided ordinary and necessary services for Gresham's day-to-day operations. These employees also included directors and officers who provided management services. Employees were paid for services rendered to Gresham as employees; such payments were reported on Forms W-2.

47.      The majority of the employees, directors, and officers also received de minimis amounts of equity and corresponding profit allocations, to the extent that the company was profitable, that were reported on Schedules K-l issued by Gresham. These amounts were generally in addition to bonuses reported on Forms W-2 and were intended as a form of inclusion.

48.      Except for Jonathan Spencer, Douglas Hepworth, and Robert Reeves, Gresham's employees, directors, and officers did not hold themselves out as owners or partners to clients. At all times, these persons performed no management or control activities, were treated as employees of Gresham, and were not required to contribute capital to Gresham. For example, an administrative assistant in the office performed the typical role of an administrative assistant. Neither the administrative assistant nor the company held the person out as an owner. The person never signed Gresham's operating agreement nor contributed capital. The person had a typical salary for an administrative assistant in this type of role of approximately $80,000.

49.      Gresham deducted amounts paid to and other amounts related to such individuals, including amounts reported on Forms W-2, but did not deduct amounts reported on Schedules K-1. The Department added back such payments and other amounts related to such individuals.

50.      Gresham made an election under I.R.C. § 754. Gresham deducted the amortization expense that resulted from the election.

**III. The Department Consistently Advanced the Same Guidance.**

51.    On August 19, 2013, the Department issued the Department's First Position stating that an entity that acted as a CPO and CTA is a commodities broker-dealer for purposes of N.Y.C. Admin. Code § 11-508(e-3). *See* N.Y.C. Dep't of Fin., Finance Letter Ruling #12-4934/UBT (Aug. 19, 2013).

52.    Specifically, the 2013 guidance provided that "the phrase 'broker or dealer registered as such by the [SEC]' does not require that a taxpayer have registered as a 'broker' or 'dealer' with the CFTC, but rather that the taxpayer have complied with all registration requirements of the CFTC to act as a broker or dealer in commodities." N.Y.C. Dep't of Fin., Finance Letter Ruling #12-4934/UBT (Aug. 19, 2013) (Internal citations omitted).

53.    On March 28, 2014, the Department reiterated its position that CPOs and CTAs were commodities broker-dealers. *See* N.Y.C. Dep't of Fin., Finance Letter Ruling #13-4950/UBT (March 28, 2014).

54.    The Department audited Gresham's UBT returns for the Years at Issue over the course of several years.

**IV. The Department Suddenly and Unilaterally Changed Its Guidance.**

55.    For the first time, on November 25, 2016 – well after the returns for the Years at Issue were filed – the Department first issued guidance taking a sudden and unilateral change (i.e., the Department's 2016 Change). *See* N.Y.C. Dep't of Fin., Update on Audit Issues: Business Income Taxes, Income Allocation (Nov. 25, 2016).

56.    Specifically, the Department issued an update on audit issues stating that "taxpayers may not rely on the [Department's First Position] to take the position that unregistered entities may characterize themselves as Registered under the Broker-Dealer Provisions [(i.e., CFTC Sourcing

Provision)]." N.Y.C. Dep't of Fin., Update on Audit Issues: Business Income Taxes, Income Allocation (Nov. 25, 2016).

## V. The Department Targets Gresham.

57.    On September 2, 2020, the Department issued a Notice of Determination to Gresham for the Years at Issue, which reflected a proposed tax deficiency in the amount of $5,280,904.67, plus interest of $4,574,608.50, and a penalty of $1,029,703.06. The Department attributed this alleged deficiency based on:

    A.    Its conclusion that Gresham did not qualify for commodities broker-dealer treatment, i.e., use of customer-based sourcing, to allocate its receipts;

    B.    Disallowance of Gresham's deduction of payments in 2011 to Falconwood on the grounds that Falconwood was a proprietor or partner in Gresham;

    C.    Disallowance of Gresham's deduction for payments in 2012 and 2013 to employees;

    D.    Disallowance of Gresham's deduction of amortization expense that resulted from its IRC § 754 election;

    E.    Other computational errors including the following:

        (i).    On the 2012 Audit Report, the Department applied a 100% payroll factor even though 0.87% of Gresham's applicable payroll was earned by employees located outside of New York City, resulting in an overstatement of tax of approximately $4,500, plus interest;

(ii).    On the 2013 Audit Report, the Department added back compensation paid to employees, including $1,090,571 of compensation paid to individuals who received no amounts reported on the Schedule K-1 issued by the partnership, resulting in an overstatement of tax of approximately $43,000, plus interest;

(iii).    On the 2013 Audit Report, the Department failed to apply the allocation factor to the flow-through income, resulting in an overstatement of tax of approximately $12,000, plus interest;

F.    Imposed a late-filing penalty in 2011, with respect only to the tax increases the Department determined; and

G.    Substantial understatement of liability penalties for the Years at Issue (under N.Y.C. Admin. Code §§ 11-525(a)(l)(A) and (j)) based on Gresham's properly extended and timely-filed 2011 return and Gresham's reliance on the Department's published guidance.

58.    On or about November 25, 2020, Gresham submitted a timely Request for Conciliation Conference.

59.    On or about February 13, 2023, the Conciliation Bureau issued a Proposed Resolution to the Conciliation Conference.

60.    On or about March 13, 2023, Gresham submitted its executed disagreement with the Proposed Resolution.

**VI. The Instant Litigation.**

61.    On March 9, 2023, Gresham and the Department entered into an agreement pursuant to which Gresham paid the full amount of the proposed deficiency under protest. The

agreement provides that such payment does not result in Gresham's waiver of any rights to protest the deficiency; payment was made solely to stop additional interest from accruing.

62.    The Conferee issued a Conciliation Decision dated March 15, 2023 upholding the Department's proposed deficiency.

63.    Gresham timely filed its Petition for a Redetermination of a Deficiency ("the Petition") with the ALJ Division on June 12, 2023.

64.    The matter was initially assigned to an ALJ within the ALJ Division. An initial conference was held in January 2024. However, the assigned ALJ resigned in the summer of 2024 and the case was not re-assigned to the (then) one remaining ALJ.

65.    Gresham filed a motion for summary determination on the proper interpretation of the CFTC Sourcing Provision on April 30, 2025.

66.    The one remaining ALJ in the summer of 2024 has since resigned. Therefore, the ALJ Division, which is responsible for hearing Gresham's Petition, currently has no ALJs to hear any cases.

67.    Currently, no ALJ is assigned to Gresham's Petition and no assignment of the Motion for Summary Determination has occurred.

**VII**. **Gresham is Irreparably Harmed.**

68.    The standard mechanism for appealing a Notice of Deficiency is to file a petition with the ALJ Division. ALJ Determinations on petitions challenging a Notice of Deficiency may be appealed to the New York City Tax Appeals Tribunal for a decision. A New York City Tax Appeals Tribunal decision may be appealed to the New York Appellate Courts.

69.    As of June 2023, the ALJ Division had only two ALJs that could hear and decide cases on staff. As noted above, after a resignation in the summer of 2024, the ALJ Division had

only one ALJ and, after another resignation, the ALJ Division currently has no ALJs to hear or decide cases. As of the time of this filing, there are no ALJs that can hear and decide cases in the ALJ Division. Accordingly, no cases are currently heard or decided in the ALJ Division.

70.     Gresham is irreparably harmed by the lack of a remedy to challenge the Notice of Deficiency. Gresham is foregoing use of funds it has paid to stop the accrual of interest, which it could otherwise regain if an ALJ could hear and decide this case.

71.     Gresham anticipates that the Department will wrongly file deficiencies for subsequent tax years based on its new position, causing Gresham further harm. Indeed, the Department has delayed auditing later years apparently because it is waiting for a resolution of the issues in this matter to apply to later periods – an auditor was assigned to the tax years 2014 through 2018, in early 2025. While waiting for this case to be resolved, Gresham is accruing millions of dollars of interest on the later tax years (2014 through current) for amounts related to the Department's erroneous application of the CFTC Sourcing Provision and will continue to accumulate interest until this matter is resolved.

## FIRST CAUSE OF ACTION
### (Violation of Procedural Due Process—Lack of a Functioning Adjudicative Forum)

72.     Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

73.     The Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution requires that states and municipalities provide taxpayers with a meaningful and timely opportunity to challenge tax determinations before an impartial adjudicator.

74.     In the context of taxation, due process does not require a specific form of remedy, but it does demand that some plain, adequate, and complete procedure exists to test the validity and legality of a tax determination.

16

75.     Gresham timely filed a Petition for a Redetermination of a Deficiency with the New York City Tax Appeals Tribunal in June 2023 and later filed a Motion for Summary Determination on April 30, 2025. As of the date of this filing, there are no ALJs available within the ALJ Division to hear or decide Gresham's Petition or motion. Due to resignations and attrition, the ALJ Division has been rendered nonfunctional for an extended period. Gresham's case remains unassigned and unadjudicated with no realistic timeline for resolution.

76.     Without access to an available and competent forum to adjudicate its challenge, Gresham is denied any meaningful opportunity to contest its asserted liabilities, including its constitutional and statutory claims.

77.     The failure to maintain a functioning adjudicative process for hearing and deciding tax controversies violates Gresham's federal right to procedural due process.

78.     In the absence of a tribunal, this Court must assume jurisdiction to adjudicate Gresham's claims and vindicate its federal rights.

### SECOND CAUSE OF ACTION
**(Gresham's Registration and Operations as a CPO and CTA
Qualify for the CFTC Sourcing Provision)**

79.     Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

80.     N.Y.C. Admin. Code § 11-508(e-3) provides rules for the computation of the gross income percentage, for "services performed by registered . . . commodities brokers or dealers."

81.     Under the applicable statute, "[t]he term 'registered . . . commodities broker or dealer' means a broker or dealer registered as such by . . . the commodities futures trading commission." N.Y.C. Admin. Code § 11-508(e-3)(2).

82.     The CFTC does not have a registration as a "broker" or "dealer." Nevertheless, because the Legislature is presumed to pass laws that have meaning, the statutory phrase "broker

or dealer registered as such by . . . the commodities futures trading commission" must be construed

so that it has meaning. *See Tonis v. Bd. of Regents of Univ. of State of N.Y.*, 295 N.Y. 286, 293

(1946) (citations omitted) ("It is one of the accepted canons of construction that statutes must be

read so that each word will have a meaning, and not so read that one word will cancel out and

render meaningless another; that each word used in an enumeration in a statute of several classes

or things must be presumed to have been used to express a distinct and different idea; that every

provision of a statute was intended to serve some useful purpose."); *see also* McKinney's Cons.

Laws of N.Y., Book 1, Statutes § 98 ("[a]ll parts of a statute must be harmonized with each other

. . . and effect and meaning must, if possible, be given to the entire statute and every part and word

thereof.").

83.    As the Department has explained:

> While the statute refers to registering as a "broker or dealer" with
> the CFTC, the CFTC does not provide a designation of broker or
> dealer. Rather, it requires registration under one or more specific
> designations, with the result that a person can trade in commodities
> as a broker or dealer without being registered as a "broker" or
> "dealer." In that context, to interpret the statute as requiring
> registration as "broker" or "dealer" would have the effect that no
> person, even though trading in commodities in compliance with the
> CFTC, could take advantage of the tax treatment afforded by Code
> section 11-508(e-3). We do not believe that it is the intent of the
> statute to set up a requirement that cannot be met in practice.

N.Y.C. Dep't of Fin., Finance Letter Ruling #12-4934/UBT (Aug. 19, 2013).

84.    The well-established rule in New York City is that ambiguity in a taxing statute

must be construed in favor of the taxpayer. *See Debevoise & Plimpton v. N.Y.S. Dept. of Taxation

& Fin.*, 80 N.Y.2d 657, 661 (1993); *Matter of Grace v. N.Y.S. Tax Comm'n.*, 37 N.Y.2d 193, 196

(1975), *rearg. denied* 37 N.Y.2d 816 (1975), *lv. denied* 338 N.E.2d 330 (1975), *quoting People ex

rel. Mutual Trust Co. v. Miller*, 177 N.Y. 51, 57 (1903).

85.     As a registered and operating CPO, Gresham operates commodity pools and solicits, accepts, and/or receives from others, funds, securities, or property for the purpose of trading in commodity interests. It executes trade on a continuous basis. These and other activities are broker or dealer activities under the commonly understood meaning of those terms and when viewed in the overall regulatory structure of the CFTC. Consequently, Gresham is a "broker or dealer registered as such by … the commodities futures trading commission" as that term is used in N.Y.C. Admin. Code § 11-508(e-3)(2).

**THIRD CAUSE OF ACTION**
**(The Department's Position Regarding CPOs and CTAs**
**Is an Invalid Administrative Rule)**

86.     Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

87.     Chapter 45 of the New York City Charter provides procedural requirements for the adoption of a "rule," including notice and public hearing requirements. N.Y.C. Charter, ch. 45, § 1043.

88.     Chapter 45 defines a "rule" as "the whole or part of any statement or communication of general applicability that (i) implements or applies law or policy, or (ii) prescribes the procedural requirements of an agency including an amendment, suspension, or repeal of any such statement or communication." N.Y.C. Charter, chapter 45, § 1041.

89.     The Department's 2016 Change is a "rule" within the City Administrative Procedures Act, as it implements a policy of general applicability.

90.     The Department did not follow the procedures of Section 1045 with respect to its statement on CPOs and CTAs so the statement is an invalidly adopted rule.

## FOURTH CAUSE OF ACTION
### (Retroactive Taxation in Violation of the Due Process Clause)

91.    Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

92.    The Fifth Amendment's Due Process Clause bars retroactive impositions of tax liability where they are "arbitrary and irrational." *United States v. Carlton*, 512 U.S. 26, 30 (1994).

93.    The Department imposed a tax liability based on changes in guidance which were implemented three years after Gresham filed all UBT returns for the Years at Issue and made applicable payments. The Department's retroactive position change imposed a tax liability that could not be foreseen or planned for prior to the implementation of the tax.

94.    The Department's retroactive implementation of its new tax guidance violates the Due Process Clause and is unconstitutional.

95.    Accordingly, the deficiency calculated is not proper, and Gresham is entitled to a refund in the amount of $12,444,839.90 for the Years at Issue plus applicable interest.

## FIFTH CAUSE OF ACTION
### (Constitutional Right to Apportion for 2011 and 2012)

96.    Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

97.    The Department's use of a 100% allocation factor for the tax periods ended 2011 and 2012 violates Gresham's right to apportionment, thereby requiring a reduction in the allocation factor. If a taxpayer has a connection with another state sufficient to be taxable in that state, then it has a right to a division of the tax base. *Standard Oil Co. v. Peck*, 342 U.S. 382, 384–85 (1952); *Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 446 (1980).

98.    Gresham is organized under the laws of Delaware, which is plainly a sufficient connection to be subject to tax in Delaware. Additionally, in 2012, Gresham had an employee

outside New York City. Accordingly, Gresham has a right to a division of the tax base, and the Department's application of a 100% allocation factor violates the right to a division of the tax base. At least some portion of the Gresham's tax base must not be allocated to New York, i.e., there must be some reduction to the New York allocation factor.

<u>**SIXTH CAUSE OF ACTION**</u>
**(Disallowance of Deduction for Payments Made to Falconwood)**

99.     Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

100.     The Department incorrectly determined that payments to Falconwood must be added back pursuant to N.Y.C. Admin Code § 11-507(3) ("No deduction shall be allowed . . . for amounts paid or incurred to a proprietor or partner for services or for use of capital.").

101.     Falconwood is not a proprietor or partner in Gresham inasmuch as it does not directly or indirectly own any interest in Gresham.

102.     Assuming arguendo that Falconwood was a proprietor or partner, under 19 RCNY § 28-06(d)(1)(ii)(D), "payments to partners for services do not include amounts paid or incurred by an unincorporated business to a partner of such business which reasonably represent the value of services provided the unincorporated business by the employees of such partner, and which . . . would constitute allowable business deductions under [19 RCNY] § 28-06(a)." The payments made by Gresham are allowable deductions under 19 RCNY § 28-06(d)(1)(ii)(D) because the amounts were: (i) deducted by Gresham; (ii) included in the Falconwood employees' gross income for Federal income tax purposes; and (iii) compensation paid which reasonably represented the value of services provided by the Falconwood employees. Additionally, other amounts of overhead deducted were for valid business expenses and not payments to partners.

## SEVENTH CAUSE OF ACTION
### (Disallowance of Deduction for Payments Made to Employees)

103.    Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

104.    The Department incorrectly determined that payments to employees and officers (that were nominal partners) must be added back pursuant to N.Y.C. Admin Code § 11-507(3). The New York City Tax Appeals Tribunal looks to various factors to determine if an individual is a partner or employee for purposes of N.Y.C. Admin Code § 11-507(3), including:

> [W]hether the purported partner: (1) held himself out as a partner to clients and to the courts; (2) signed the partnership agreement or otherwise consented to its terms; (3) was required to contribute to the partnership's capital; (4) had an interest in partnership assets; (5) participated in partnership decisions as to management; (6) was entitled to periodic financial statements showing information about the partnership's financial condition; (7) was entitled to a share of the profits; (8) was liable for partnership losses; (9) reported the compensation from the partnership as partnership income; and (10) claimed a deduction for a contribution to a Keogh plan. Also relevant to the Tribunal's determination was whether the partnership: (1) withheld income taxes or FICA from the purported partner's compensation; (2) issued IRS Form W-2 rather than Form K-1 to the purported partner; (3) paid the employer's share of FICA and other employment taxes with respect to the compensation paid to the purported partner; (4) deducted the compensation paid to the purported partner as employee wages; (5) represented to a government agency that the individual was a partner; and (6) listed the individual as a partner on its letterhead or in its listing in an industry directory such as the Martindale-Hubbell Law Directory.

*Petition of Ladas and Parry*, TAT(E) 98-19(UB) (N.Y.C. Tax App. Trib., Jan. 2, 2003).

105.    Applying the factors from *Ladas and Parry*, the payments at issue were not paid to "partners" for purposes of the addback. Gresham withheld taxes, paid the employer's share of employment tax, issued W-2 forms, and deducted the compensation paid as wages. Moreover, these "partners" did not hold themselves out as owners of Gresham to clients and performed no management or control activities, and were not required to contribute capital to Gresham.

22

## EIGHTH CAUSE OF ACTION
**(Amortization Deduction Related to IRC § 743(b) for the Years at Issue)**

106.    Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

107.    Gresham properly deducted amortization related to the IRC § 743(b) basis adjustment and should be permitted to deduct the amortization expense that resulted from its valid IRC § 754 election because (i) partnerships are permitted to make such elections for federal income tax purposes, (ii) the starting point in computing the UBT is federal taxable income, and (iii) there is no statutory, regulatory or judicial authority for requiring an add-back of amortization deductions resulting from IRC § 754 elections. Additionally, although a recent Statement of Audit Procedure indicates that New York City follows the *Dolly* case (*Matter of Dolly Co. v. Tully*, 65 A.D.2d 99 (N.Y. App. Div. 3d Dep't 1978)) for UBT purposes, audit procedures merely represent the Department's interpretation of existing law and are not themselves binding on taxpayers. Further, as this guidance was issued in 2017, it should not be applied to Gresham retroactively. *See In re Meredith Corp. v. Tax Appeals Trib.*, 102 A.D.3d 156 (N.Y. App. Div. 3d Dept. 2012) ("Retroactively applying a changed interpretation upon which a taxpayer was relying is 'arbitrary and capricious.'").

## NINTH CAUSE OF ACTION
**(Other Computational Issues for the Years at Issue)**

108.    Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

109.    The Department's other computation errors described above are incorrect.

## TENTH CAUSE OF ACTION
### (Improper Imposition of Penalties for the Years at Issue)

110.    Gresham repeats and incorporates all prior allegations by reference as though fully set forth herein.

111.    The Department imposed on Gresham a penalty of $501,612.60 under N.Y.C. Admin. Code § 11-525(a)(1)(A), for the late filing of its 2011 UBT return. Gresham timely filed its 2011 return on extension. Consequently, the late filing penalty under N.Y.C. Admin. Code § 11-525(a)(1)(A) for 2011 must be abated. N.Y.C. Admin. Code § 11-525(a)(1)(A) simply does not apply here.

112.    Even if the 2011 UBT return was filed late, N.Y.C. Admin. Code § 11-525(a)(1)(A) provides that penalties for failure to file a tax return must be abated if "it is shown that such failure is due to reasonable cause and not due to willful neglect." Gresham relied on its tax preparer to properly extend and timely file its 2011 tax return. Therefore, to the extent that its 2011 return was filed late, such failure is due to reasonable cause and not due to willful neglect on the part of Gresham, because Gresham had a reasonable filing position that was consistent with the Department's First Position (although later reversed). Accordingly, the penalty of $501,612.60 for late filing of the 2011 UBT return is inappropriate and must be abated.

113.    With respect to the penalties imposed for substantial understatement of liability, penalties must be abated. N.Y.C. Admin. Code § 11-525(j) provides that penalties for substantial underpayment of liability are to be abated "on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith." Gresham's return position is reasonable and in good faith. This is evidenced by the fact that during the Years at Issue, the Department issued guidance consistent with such position, which it only later reversed. Moreover, Gresham relied on the opinions of tax professionals for its positions. Therefore, the

penalty of $528,090.46 for substantial understatement of liability for the Years at Issue is inappropriate and must be abated.

## PRAYER FOR RELIEF

In view of the foregoing, Plaintiff requests that the Court grant the following relief:

a.      Hold that the failure of the New York City Tax Appeals Tribunal to provide a functioning adjudicative forum to hear and decide Gresham's Petition and Motion for Summary Determination deprives Gresham of its right to procedural due process under the United States Constitution, and that, in the absence of such a forum, this Court must exercise jurisdiction to resolve the dispute.

b.      Assume jurisdiction over the matter to resolve the tax, interest, and penalties at issue and prevent continued constitutional harm.

c.      Hold that Gresham's CFTC registration and activities as a CPO and CTA qualify for sourcing under the CFTC Sourcing Provision.

d.      Hold that the Department's 2016 Change constitutes an invalid administrative rule adopted without compliance with the New York City Administrative Procedures Act.

e.      Hold that the Department's application of a 100% allocation factor for the tax years ended 2011 and 2012 violates Gresham's constitutional right to apportionment.

f.      Hold that Gresham correctly reported its income with respect to the other causes of action set forth above.

g.      Order that Gresham be refunded the unlawfully retained taxes in an amount totaling $12,444,839.90 plus interest.

h.      Grant Gresham's costs of action and such other relief as the Court deems just and proper.

Dated: June 3, 2025

Respectfully submitted,

/s/ Eli Berman
_____
Eli Berman
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017
(212) 547-5400
(212) 547-5444 fax

Richard C. Call
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA  02116
(617) 535-3974
(617) 535-3800 fax

Michael J. Hilkin
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017
(212) 547-5400
(212) 547-5444 fax

Jonathan C. Hague
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017
(212) 547-5400
(212) 547-5444 fax